1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT
9        FOR THE NORTHERN DISTRICT OF CALIFORNIA
10

11  LYLE E. NORBERT,                    No. C 07-2074 MMC

12          Petitioner,          **ORDER DENYING PETITION FOR WRIT**
                                   **OF HABEAS CORPUS**
13      v.

14  T. FELKER, Warden

15          Respondent.
      _____/
16

17      Before the Court is Lyle E. Norbert's ("Norbert") petition for a writ of habeas corpus,

18  pursuant to 28 U.S.C. § 2254.  Respondent T. Felker has filed an answer and a

19  memorandum of points and authority in support thereof, to which Norbert has filed a reply.

20  Having read and considered the papers filed in support of and in opposition to the petition,

21  the Court rules as follows.

22                        **PROCEDURAL BACKGROUND**

23      Norbert "was convicted following a jury trial [in Alameda County Superior Court] of

24  second degree murder (Pen. Code § 187), evading a peace officer causing death or

25  serious bodily injury (Veh. Code § 2800.3), possession of concentrated cannabis (Health &

26  Saf. Code § 11357, subd. (a)), and sale or transportation of marijuana (Health & Saf. Code

27  § 11360, subd. (a))."  See People v. Norbert, 2005 WL 2328792, *1 (Cal. App. 2005), cert.

28  denied, 126 S. Ct. 1787 (2006).  "He was sentenced to an aggregate indefinite term of 15

1  years to life in state prison."  Id.  On September 23, 2005, the California Court of Appeal

2  affirmed the judgment.  See id.  On January 4, 2006, the California Supreme Court denied

3  review, (see Resp't's Ex. H), and, on April 17, 2006, the United States Supreme Court

4  denied Norbert's petition for a writ of certiorari, (see Resp't's Ex. J).

5       In the instant petition, Norbert challenges only his "murder conviction."  (See Mem.

6  of P. & A. in Support of Petition, filed April 12, 2007, at 1:15-20.)

7  **FACTUAL BACKGROUND**[1]

8       At about 1:00 a.m. on March 14, 2001, Officer Brent Pucci ("Officer Pucci") of the

9  California Highway Patrol ("CHP") was driving on Interstate 80 with his partner, Officer

10  George Carpenter ("Officer Carpenter"), in the front passenger seat.  Both officers were

11  wearing fully distinctive CHP tan uniforms, with shoulder patches and badges.  The black

12  and white patrol vehicle with "state seal" symbols on both front doors was equipped with

13  overhead lighting, spot lights, front and rear lighting, "wig wag lights," and siren, all of which

14  were functional.  As they traveled eastbound on Interstate 80 past the Gilman Street exit in

15  Berkeley, they began to follow a Pontiac Bonneville that was weaving and straddling the

16  lanes.

17       At the Interstate 80 Potrero Avenue exit in Berkeley, the Bonneville left the freeway.

18  To initiate a traffic stop, the officers activated the siren and emergency lights, including the

19  front red bar of lights on the top of the vehicle, which are steady at the ends and oscillating

20  in the center, and the front wig-wag "high and low beam" clear headlights.  Officer Pucci

21  used the loudspeaker to direct the driver of the Bonneville to pull into a "turn out" of the

22  Potrero Avenue off-ramp.  Instead, the driver continued slowly past the turn out. At the

23  intersection, although Officer Pucci directed the driver "straight ahead," the driver turned

24  right onto Potrero Avenue.

25       Officer Pucci "upgraded to a Code Three status" by pressing a button that triggered

26  all of the lights on the overhead bar – blue, red, yellow and amber – to "rotate

27  

28      [1]The factual background is derived from the opinion of the California Court of
Appeal.

2

1  simultaneously." He also pressed the red siren button, which activated high and low siren

2  tones. He then notified dispatch that he and Officer Carpenter "were in pursuit" of the

3  Bonneville. As the Bonneville made a right turn onto San Pablo Avenue, Officer Pucci was

4  able to identify Norbert as the driver and sole occupant of the vehicle.

5       The officers followed Norbert as he drove southbound through a commercial area in

6  El Cerrito and Richmond on San Pablo Avenue at speeds of 45 to 50 miles per hour, and

7  into Albany, where their speed increased to over 65 miles per hour. Norbert began to pull

8  away from the officers as he failed to decrease speed through the intersections. The

9  pursuit then moved into Berkeley as Norbert increased his speed to greater than 75 miles

10 per hour and drove through a red light at the intersection of San Pablo and University.

11 Officer Pucci "did not feel comfortable" at the speed traveled in that location and decided to

12 "discontinue the chase." He pushed the button to "shut down" the emergency lights and

13 siren, and pulled into the right lane.

14      The officers noticed that Norbert slowed the Bonneville and activated the right turn

15 signal. Officer Pucci pulled behind the Bonneville and "re-initiated the code three lights and

16 siren," with rotating lights, siren, and wig-wag lights all working. Norbert immediately

17 accelerated away southbound on San Pablo Avenue at a speed that reached

18 approximately 80 miles per hour.

19      As the Bonneville approached the intersection of San Pablo and Ashby, with the

20 patrol vehicle in pursuit about 100 feet behind, a white Dodge Neon appeared in the

21 intersection directly ahead, facing westbound. Another vehicle was situated in the

22 southbound left turn lane of San Pablo Avenue. When Norbert reached the intersection,

23 the light was red for traffic traveling southbound on San Pablo Avenue. He did not

24 decrease his speed and his brake lights did not illuminate. The CHP officers observed a

25 "T-Bone type" of collision: the front of the Bonneville struck the passenger side of the

26 white Neon. A "ball of fire" erupted at the point of impact. The Neon spun and hit a utility

27 box on the right side of San Pablo Avenue; the Bonneville continued straight to the

28 southwest corner of the intersection of San Pablo Avenue and Murray Street. The

3

1    intersection became engulfed in flames, smoke and debris.

2        Norbert was seen by the officers as he left his car, looked around momentarily, and

3    then ran westbound on Murray Street.  Both officers pursued him on foot, and, with guns

4    drawn, yelled at him to stop and "get down."  About 50 feet from his car, Norbert stopped,

5    dropped to the ground, and was apprehended by the officers.

6        Officer Carpenter then walked to the Neon to check on the occupant of that car.  He

7    immediately realized that the driver was dead.  The victim's death resulted from multiple

8    blunt force injuries, with a "complete laceration of the aorta," and occurred within a minute

9    of the accident.

10       Officer Pucci noticed that Norbert suffered small lacerations to his hands and around

11   the wrist.  Officer Pucci also smelled "the odor of an alcoholic beverage that was emitting"

12   from Norbert.  Due to the "severity" of the accident, no field sobriety tests were

13   administered.

14       One of the paramedics who treated Norbert inside the ambulance also detected an

15   "obvious" odor of "alcohol on his breath."  The California Highway Patrol officer who

16   accompanied Norbert to the hospital in the ambulance smelled "an odor of an alcoholic

17   beverage coming from him," and, in addition, noticed that Norbert's speech was "muffled"

18   or "slurred," and that his eyes "looked bloodshot and red and watery."  A "handheld device"

19   used to test Norbert's breath in the ambulance registered the presence of alcohol.

20       According to the paramedic's testimony, Norbert's neurological function was normal,

21   his pupils were "equal and reactive," he had no obvious speech impediment, he

22   appropriately responded to commands, and he apparently did not lose consciousness.

23   The pupils of Norbert's eyes, however, exhibited "nystagmus" – that is, a bouncing back

24   and forth – which is consistent with ingestion of alcohol.  Norbert's blood was drawn at the

25   hospital at 2:02 a.m.  His blood-alcohol level measured 0.05 percent; his blood also

26   contained 8 nanograms per milliliter of THC and 187 nanograms per milliliter of

27   C00H-THC.

28       Norbert's Bonneville was searched at the scene of the accident.  Two plastic

baggies that contained marijuana and hashish in usable amounts were found inside the pocket of a "man's black jacket" recovered from the rear seat of the vehicle.

Expert opinion testimony was presented by the prosecution on the effects of alcohol and marijuana upon driving.  Dr. Sharon Van Meter testified generally that alcohol consumption, even at a level of 0.05 percent, adversely impacts the attributes necessary to safely drive an automobile:  coordination, attention span, judgment, and response time to stimuli.  Forensic toxicologist Bill Posey ("Posey") testified that marijuana in combination with alcohol produces an "added effect," and perhaps a "super additive effect," upon the ability to drive a vehicle, particularly in a person who chronically uses the drug.  Thus, according to studies, a person with a blood-alcohol level of 0.04 percent combined with a "low dosing" of marijuana will exhibit a "behavior pattern" that is "more consistent with someone driving at an .08," and typically with a larger dose will result in an additional contribution from marijuana of 0.07, for a "minimum rate of .11 on their driving ability."  In response to a hypothetical question, Posey estimated that a person of Norbert's size who registers a blood-alcohol level of 0.05 percent, along with 8 nanograms per milliliter of THC and 187 nanograms per milliliter of C00H-THC, will function at a level of 0.09 to 0.12, which is considered "marked" driving impairment for 90 percent of the population.

To prove Norbert's mental state as required for the charge of second degree murder, the prosecution adduced evidence of numerous prior uncharged acts, the first of which occurred at approximately 3:00 a.m. on the morning of March 11, 1984.  Norbert, who matched the description of an "outstanding suspect" in a reported "auto burglary in progress," was observed by two San Francisco police officers on the corner of Sutter and Broderick Streets in San Francisco as he entered a black and red vehicle and took a position in the driver's seat.  When Norbert began to back the car out of a parking lot, the officers identified themselves and asked him to stop.  Norbert continued backing down Broderick Street at high speed in a northbound direction, then drove forward eastbound on Sutter Street as another uniformed patrol unit arrived on the scene and activated its siren and red and blue lights.  Norbert fled in the black and red vehicle through city streets at

speeds of 65 to 85 miles per hour, running at least several red lights, until he turned onto a freeway on-ramp.  After he entered the freeway and passed another car on the left, Norbert's vehicle struck a guardrail and spun completely around twice before coming to rest.

On January 16, 1996, at about 10:40 p.m., Norbert was observed by a San Francisco police officer "driving erratically at a high rate of speed" in the Bay View District. The officer followed Norbert's car in a marked patrol vehicle until it stopped "on its own." He then illuminated his red lights and spotlight on Norbert before he approached the car. Norbert was not responsive to the officer, and "started moving the car forward" rapidly as the officer spoke to him.  The officer returned to his vehicle and pursued Norbert with the emergency lights and siren activated.  Norbert "almost collided" with the officer's vehicle, then drove away "at an even higher rate of speed" until the officer "lost sight of him."  Five minutes later, other officers apprehended Norbert and placed him in custody.

Norbert was also arrested for driving under the influence at approximately 3:00 a.m., on October 31, 1997, after he collided with several parked cars in a residential district in the area of 26th Street in Noe Valley, San Francisco.  Norbert fled the scene after the accident, but an officer followed a trail of radiator coolant three blocks to a Mustang parked on Douglas Street at "a 45-degree angle in the roadway."  The Mustang suffered "major damage" to the front end, the entire passenger side, and half of the driver's side.  Norbert was found in the driver's seat and taken into custody.  His eyes were bloodshot, drooping, and watery, an odor of alcohol came from him, and he staggered as he walked.  Two breath tests conducted at 3:58 and 3:59 a.m. that morning measured Norbert's blood-alcohol level at 0.09 and 0.10.

On January 31, 1999, at about 2:45 a.m., Norbert was observed by CHP officers as he drove a Pontiac Grand Am on Interstate 80 eastbound in west Contra Costa County at a speed of 85 miles per hour and "jerked to go around" other vehicles on the freeway.  After Norbert failed to respond to overhead emergency lights and a "public address system" command to "pull over to the right shoulder and stop," the officers activated the patrol

6

vehicle siren and full rotating bar of "wig wag" high beam lights.  Norbert slowed to 30 miles per hour and pulled onto the right shoulder momentarily, but then accelerated rapidly "back into the fast lane" of the freeway.  The pursuit continued eastbound on Interstate 80 for approximately 16 miles, across the Carquinez Bridge where Norbert raced through the toll booth at 50 miles per hour, and thereafter reached a speed of up to 90 miles per hour on the freeway.  Norbert left the freeway at the Red Top Road exit in Fairfield, and traveled at excessive speeds on the city streets, where he also repeatedly drove through stop signs and nearly struck a van at an intersection.  The officers eventually implemented a "pursuit intervention technique," which consisted of "ramming" their patrol vehicle into Norbert's Pontiac three times.  After the third collision, a Vallejo police officer reached the pursuit and managed to pull in front of Norbert's car so he was "boxed in" and unable to continue any further.  With guns drawn, the officers repeatedly ordered Norbert out of the Pontiac. He refused to exit the vehicle and was forcibly removed by the officers.  Once Norbert was pulled from the driver's seat, he "began fighting" and "pulling away" from the officers until he was taken to the ground and handcuffed.  One of the officers observed that Norbert's eyes were red and watery, his speech was slurred, and "there was an odor of an alcoholic beverage emitting from his breath."  A preliminary alcohol screening device measured Norbert's blood-alcohol level at 0.09 percent.  A search of the Pontiac uncovered a baggie of marijuana in the trunk.  During the booking process, Norbert admitted that he was "too drunk," and told the officer he "always runs from the police, but he always gets caught, because he's too slow."  He also admitted he placed the marijuana in the trunk of his car.

    At 2:45 a.m. on the morning of November 3, 2000, a CHP officer in a marked vehicle observed Norbert, in the driver's seat of a white car on Interstate 80 in Richmond, driving in excess of 80 miles per hour and "drifting out of [his] lane."  Norbert left the freeway at Solano Avenue and pulled to the shoulder of a residential intersection in response to the officer's verbal instructions and activation of "forward lights."  When the officer approached the passenger side of Norbert's rental car, the officer "smelled a distinctive odor of an alcoholic beverage within the vehicle."  The officer observed that

7

Norbert's eyes were "red and watery," his speech was "thick and slow and slurred," and he was "unsteady on his feet."  Norbert also performed poorly on field sobriety tests administered by the officer.  Preliminary screening tests of Norbert's blood-alcohol level registered results of 0.098 and 0.10.  After Norbert was arrested, the officer found marijuana in the center console of the car and a baggie of hashish in the pocket of the driver's side armrest.

Evidence was also presented that, beginning in April of 1999, Norbert attended an 18-month court-mandated program called Counseling Services for Drinking Drivers, which is designed for "people who receive two or more D.U.I.s."  The program has an education component of six weekly sessions that teach methods to avoid or limit alcohol use and to prevent driving under the influence, followed by weekly "group sessions" with other alcohol offenders, and individual meetings with an assigned counselor.  According to the program director, Norbert completed all the requirements of the program.

Norbert testified at trial and presented his account of the accident that occurred on March 14, 2001.  He recalled that he visited with relatives at his father's house in Hunter's Point that day, where he consumed a "little bottle of Hennessey and a little bottle of Grand Marnier" beginning around 8:30 or 9:00 p.m.  He also smoked marijuana and hashish to ease "the pain" of his previously fractured femur.  According to Norbert, he did not feel impaired when he left his father's house to drive to his home in Fairfield.

As Norbert reached Interstate 80, he observed two cars "shoot by" his Bonneville at a high rate of speed, followed by a CHP vehicle in pursuit.  The CHP vehicle then "got behind" Norbert.  He saw its red emergency lights flashing and heard the wail of the siren. Norbert left the freeway to "pull over," but recalled he had a 9 millimeter gun in the car that he had confiscated from his son.  He "just wanted to get rid of the gun," so he turned right after he left the freeway, then made another right turn at a speed of 45 or 50 miles per hour.  He saw the CHP vehicle following him in pursuit with the headlights and overhead rotating "red, yellow, red" lights flashing.  Norbert testified that he "could have" run a red light during his flight from the CHP vehicle on San Pablo, but was "not sure."  As Norbert

8

passed each of the intersections, he attempted to look for approaching cars and determine if the light was green in his direction.  He acknowledged, however, that in his effort to escape and discard the gun he would not have stopped at a red light.  He felt that he was neither drunk nor high, and had control of his car "at all times."

When Norbert sped far enough away from the CHP vehicle – about a quarter mile – he threw the gun out of the passenger window of his car.[2]  He then continued down San Pablo Avenue at a speed of 65 to 70 miles per hour to "get as far away from the gun as possible."  When Norbert noticed the "police had stopped" and turned off the emergency lights, he "slowed down tremendously."  He intended to "get back to the freeway and go home," and not stop for the patrol vehicle.

Norbert then observed a car immediately behind him with "no lights on" or siren sounding, although he recognized that it was a patrol vehicle.  He "panicked," thinking the CHP officers had "found the gun," and "sped off" down San Pablo Avenue again.  Norbert recalled that he passed through intersections, but testified he did not run any red lights or have any "close calls" with other cars.  When Norbert entered the intersection of San Pablo and Ashby at a speed of about 70 to 75 miles per hour, he perceived that the light in his direction was green.  He did not see the Dodge Neon until he reached the intersection, and "couldn't break" in time to avoid the collision.  An explosion resulted from the collision, and he thought the Neon "caught on fire."

After the accident, Norbert's car came to rest on the corner.  He saw the CHP vehicle near him with the emergency lights activated.  His face was burning, and he "just wanted to get away from the car" to avoid an explosion or fire.  As Norbert walked quickly away from his car, he heard the officers yelling at him to "get down on the ground."  He immediately "laid down" on his stomach as he was directed.  When one of the officers told Norbert he had "killed someone," he "went into shock" and "shut everything out."  He was then arrested, handcuffed, and taken to the patrol vehicle, after which paramedics arrived

---

[2]The parties stipulated that a 9 mm Taurus semiautomatic pistol was found in the number one lane of San Pablo Avenue just south of the curb line at Solano Avenue.

1  to transfer him to an ambulance and treat him.  Norbert testified that he did not feel

2  intoxicated or affected by marijuana at the scene of the accident or in the ambulance.  He

3  also asserted that neither on March 14, 2001 nor during the prior incidents did he believe

4  his driving was dangerous to human life.

5  **DISCUSSION**

6       A district court may grant a petition challenging a state conviction on the basis of a

7  claim reviewed in state court only if the state court's adjudication of the claim: "(1) resulted

8  in a decision that was contrary to, or involved an unreasonable application of, clearly

9  established Federal law, as determined by the Supreme Court of the United States; or

10  (2) resulted in a decision that was based on an unreasonable determination of the facts in

11  light of the evidence presented in the State court proceeding."  See 28 U.S.C. § 2254(d).

12  "[I]t is the habeas applicant's burden to show that the state court applied [clearly

13  established federal law] to the facts of his case in an objectively unreasonable manner."

14  Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

15       Norbert argues he is entitled to relief on five claims, which the Court considers in

16  turn.

17  **A.  Refusal to Instruct on Vehicular Manslaughter**

18       At trial, Norbert did not deny driving the car that killed the victim, but denied having

19  the requisite mental state to support a conviction for second degree murder.  Norbert

20  requested the trial court instruct the jury on vehicular manslaughter and involuntary

21  manslaughter.  The trial court agreed to instruct the jury on involuntary manslaughter,

22  because such offense "is a lesser included offense of murder," but declined to instruct on

23  vehicular manslaughter, finding it was "not a lesser included offense."  (See Reporter's

24  Transcript ("RT") 1316.)[3]

25       On direct appeal, Norbert conceded that vehicular manslaughter is a "lesser

26  related," as opposed to "lesser included," offense, and that, under state law, the trial court

27

28       [3]The Reporter's Transcript is Exhibit B to respondent's answer.

10

1   is not obligated to instruct on a "lesser related" offense where, as here, the prosecutor

2   objects to such instruction.  (See Resp't's Ex. C at 39.)  Norbert argued that under federal

3   law, however, a defendant is entitled to have the jury instructed on the defense theory of

4   the case, if there is evidence to support the theory.  Consequently, Norbert argued,

5   because his defense to the charge of second degree murder was that he had committed a

6   vehicular manslaughter, federal law required the trial court to instruct on vehicular

7   manslaughter.  The California Court of Appeal rejected Norbert's claim, finding a defendant

8   has no federal right to an instruction on a "lesser related" offense.

9        Norbert argues the California Court of Appeal's determination constitutes a clearly

10  unreasonable application of federal law.  The Court disagrees.  The Supreme Court has

11  expressly held that a defendant in a capital case has no federal constitutional right to

12  instruction on a "lesser related" offense, even when charged with a capital crime for which

13  no "lesser included offense exists."  See Hopkins v. Reeves, 524 U.S. 88, 96-97 (1998)

14  (noting Nebraska law required "instructions only on those offenses that have been deemed

15  to constitute lesser included offenses of the charged crime"; further noting, "[w]e have

16  never suggested that the Constitution requires anything more").

17       Norbert relies on the following language in two Supreme Court cases:

18  (1) "prevailing notions of fundamental fairness . . . require that criminal defendants be

19  afforded a meaningful opportunity to present a complete defense," see Trombetta v.

20  California, 467 U.S. 479, 485 (1984); and (2) "[a]s a general proposition a defendant is

21  entitled to an instruction as to any recognized defense for which there exists evidence

22  sufficient for a reasonable jury to find in his favor," see Matthews v. United States, 485 U.S.

23  58, 63 (1988).  Neither Trombetta nor Matthews, both of which pre-date Hopkins v.

24  Reeves, addressed the question of whether a defendant has a federal constitutional right to

25  have the jury instructed on a lesser-related offense.[4]  Moreover, the general statements set

26

27       [4]In Trombetta, the Supreme Court held that a defendant prosecuted for driving under
    the influence was not deprived of due process where the state had not preserved breath
28  samples taken at the time of arrest, see Trombetta, 467 U.S. at 488-89; in Matthews, the
    Supreme Court determined that, where there is sufficient evidence to support a finding of

1    forth in Trombetta and Matthews on which Norbert relies cannot be interpreted as "clearly

2    established federal law" recognizing a federal constitutional right to instruction on lesser

3    related offenses, in light of the express holding in Hopkins v. Reeves that there is no such

4    federal right.

5           Accordingly, Norbert has failed to show he is entitled to relief on this claim.

6    **B.  Instructions on Distinction Between Murder and Involuntary Manslaughter**

7           As noted, Norbert requested, and the trial court agreed to give, instructions on the

8    lesser included offense of involuntary manslaughter.  During the instruction conference,

9    Norbert requested that the trial court give a revised form of CALJIC 8.51.

10          In its unrevised form, CALJIC 8.51 reads as follows:

11          If a person causes another's death, while committing a felony which is
            dangerous to human life, the crime is murder.  If a person causes another's
12          death, while committing a misdemeanor or infraction which is dangerous to
            human life under the circumstances of its commission, the crime is
13          involuntary manslaughter.

14          There are many acts which are lawful but nevertheless endanger human life.
            If a person causes another's death by doing an act or engaging in conduct in
15          a criminally negligent manner, without realizing the risk involved, he is guilty
            of involuntary manslaughter.  If, on the other hand, the person realized the
16          risk and acted in total disregard of the danger to life involved, malice is
            implied, and the crime is murder.

17
     See CALJIC 8.51.
18
            Norbert requested that the first paragraph of CALJIC 8.51 be revised to eliminate the
19
     first sentence, for the reason that he was not charged with felony murder, and that the
20
     second sentence be altered to read, "If a person causes another's death while committing
21
     an unlawful act, which is dangerous to human life under the circumstances of its
22
     commission, the crime is involuntary manslaughter."  (See RT 1330.)  The trial court agreed
23
     not to read the first sentence of the first paragraph of CALJIC 8.51, but denied Norbert's
24
     request to read a revised form of the second sentence, noting that the proposed revised
25
     language was "duplicative of other instructions the court [would] give and [was] possibly
26

27   ─────────────────────

28   entrapment, a defendant is entitled to an entrapment instruction, even if the defendant
     "denies one or more elements of the crime," see Matthews, 485 U.S. at 62.

misleading." (See RT 1332.)  In particular, the trial court found the language suggested by

Norbert was duplicative of language contained in CALJIC 8.45, which instruction the Court

intended to read to the jury.  (See id.)[5]

At trial, the trial court instructed the jury on the elements of second degree murder,

including an instruction that the essential element of "malice" could be "implied when: one,

the killing resulted from an intentional act; two, the natural consequences of the act are

dangerous to human life; and, three, the act was deliberately performed with knowledge of

the danger to and with conscious disregard for human life." (See RT 1346.)

After instructing as to the elements of second degree murder, the trial court gave the

following instructions, specifically, CALJIC 17.10, 8.45, and 8.46, as modified to reflect the

particular charges against Norbert:

> If you are not satisfied beyond a reasonable doubt that the defendant is guilty
> of the crime of murder, you may nevertheless convict him of a lesser crime of
> involuntary manslaughter if you are convinced beyond a reasonable doubt
> that the defendant is guilty of the lesser crime.
>
> Thus, you are to determine whether the defendant is guilty or not guilty of the
> crime of second degree murder or of the lesser crime of involuntary
> manslaughter.  In doing so, you have discretion to choose the order in which
> you evaluate each crime and consider the evidence pertaining to it.  You may
> find it productive to consider and reach a tentative conclusion on all charges
> and lesser crimes before reaching any final verdict.  However, the court
> cannot accept a guilty verdict on a lesser crime unless you have unanimously
> found the defendant not guilty of the greater crime.

(See RT 1347:3-17.)

> Every person who unlawfully kills a human being, without an intent to kill, and
> without conscious disregard for human life, is guilty of the crime of involuntary
> manslaughter in violation of Penal Code section 192, subdivision (b).
>
> A killing in conscious disregard for human life occurs when a killing results
> from an intentional act, the natural consequences of which are dangerous to
> life, which act was deliberately performed by a person who knows that his
> conduct endangers the life of another and who acts with conscious disregard
> for human life.

//

---

[5]Although not expressly set forth in the record, it appears that neither party
requested the trial court read the second sentence of the first paragraph of CALJIC 8.51 in
its unrevised form.

13

A killing is unlawful within the meaning of this instruction if it occurred:
> One, during the commission of an unlawful act, which is dangerous to human life under the circumstances of its commission; or
> Two, in the commission of an act ordinarily lawful, which involves a high degree of risk of death or great bodily harm, without due caution and circumspection.

An "unlawful act" may include a violation of any of the following statutes:

> Section 21453(a) of the Vehicle Code, which requires a driver facing a steady red circular traffic light to stop before entering an intersection and remain stopped until an indication to proceed is shown;

> Section 22350 of the Vehicle Code, which prohibits driving a vehicle upon a roadway at a speed greater than is reasonable or prudent, having due regard for weather, visibility, the traffic on, and the surface and width of, the roadway, and in any event at a speed which endangers the safety of persons or property;

> and Section 2800.3 of the Vehicle Code, which is the crime charged in Count 2, the elements of which I will explain to you elsewhere in these instructions.

The commission of an unlawful act, without due caution and circumspection, would necessarily be an act that was dangerous to human life in its commission.

In order to prove this crime, each of the following elements must be proved:
> One, a human being was killed; and
> Two the killing was unlawful.

(See RT 1347:18 - 1349:1.)

The term "without due caution and circumspection" refers to negligent acts which are aggravated, reckless and flagrant and which are such a departure from what would be the conduct of an ordinary prudent, careful person under the same circumstances as to be in disregard for human life, or an indifference to the consequences of such acts. The facts must be such that the consequences of the negligent acts could reasonably have been foreseen. It must also appear that the death was not the result of inattention, mistaken judgment or misadventure, but the natural and probable result of an aggravated, reckless or grossly negligent act.

In determining whether a result is natural and probable, you must apply an objective test. It is not what the defendant actually intended, but what a person of reasonable and ordinary prudence would have expected likely to occur. The issue must be decided in light of all the circumstances surrounding the incident.

A "natural" result is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened.

"Probable" means likely to happen.

(See RT 1349:2-22.)

14

1

Next, the trial court read the second paragraph of CALJIC 8.51:

2

3

4

5

There are many acts which are lawful but nevertheless endanger human life. If a person causes another's death by doing an act or engaging in conduct in a criminally negligent manner, without realizing the risk involved, he is guilty of involuntary manslaughter.  If, on the other hand, the person realizes – strike that.  Start again.  If, on the other hand, the person realized the risk and acted in total disregard of the danger to life involved, malice is implied, and the crime is murder.

6

(See RT 1349:23 -  1350:3.)

7    On direct appeal, Norbert argued he was deprived of due process by the trial court's

8    failure to instruct the jury with the version of CALJIC 8.51 Norbert had suggested,

9    specifically, his proposed revision of the second sentence of the first paragraph thereof.  In

10   particular, Norbert argued that because the version of CALJIC 8.51 read to the jury

11   referenced only "lawful" acts, the jury likely understood the instruction to mean that a

12   conviction for involuntary manslaughter could only be based on a "lawful" act.  The

13   California Court of Appeal rejected Norbert's claim, finding the instructions, considered as a

14   whole, would not have been misunderstood by the jury in the manner asserted by Norbert.

15   Specifically, the Court of Appeal found that, in light of all the instructions given, "the jury

16   was aware that . . . those unlawful acts committed without intent to kill and without

17   conscious disregard for human life constituted involuntary manslaughter rather than

18   murder."  See Norbert, 2005 WL 2328792, at *19.

19   Before this Court, Norbert argues the Court of Appeal's determination constitutes an

20   unreasonable application of Estelle v. McGuire, 502 U.S. 62 (1991) and Cupp v. Naughten,

21   414 U.S. 141 (1973).  In Estelle, the Supreme Court, quoting Cupp, held that, in

22   considering a habeas claim based on an allegedly "ailing instruction," the federal court

23   considers "'whether the ailing instruction by itself so infected the entire trial that the

24   resulting conviction violates due process.'"  See Estelle, 502 U.S. at 72 (quoting Cupp, 414

25   U.S. at 147).  Such "instruction 'may not be judged in artificial isolation,' but must be

26   considered in the context of the instructions as a whole and the trial record."  See id.

27   (quoting Cupp, 414 U.S. at 147).

28   Here, the Court of Appeal considered the instructions as a whole, which, as set forth

15

1    above, explained to the jury that a finding of guilt of involuntary manslaughter could be

2    based on certain "unlawful" acts or on certain "lawful" acts, and determined the jury would

3    not have erroneously believed that a finding of guilt as to involuntary manslaughter could

4    only be based on certain "lawful" acts.  Norbert fails to explain how the jury somehow

5    would have believed they were to ignore the lengthy instructions pertaining to "unlawful"

6    acts, which included an instruction identifying three alleged "unlawful" acts on which a

7    finding of manslaughter could be based, (see RT 1347-48), merely because one instruction

8    correctly stated that a "lawful" act could, depending on the manner in which it was

9    performed and the defendant's mental state, give rise to a conviction for either involuntary

10   manslaughter or murder.  In sum, the Court of Appeal did not unreasonably apply Estelle

11   and Cupp.

12          Accordingly, Norbert has failed to show he is entitled to relief on this claim.

13   **C. Admission of Prior Acts Evidence**

14          As noted, the prosecution offered evidence that Norbert, on March 14, 2001, drove

15   at excessive speeds in an attempt to evade police officers, had been drinking and using

16   marijuana prior to such driving, and caused property damage and a death, as a result of his

17   running a red light during his attempt to evade the officers.  The prosecutor also offered

18   evidence of five prior instances in which Norbert drove vehicles in an unlawful manner.  In

19   three of those five prior instances, Norbert drove at excessive speeds in an attempt to

20   evade police officers.  In two of those five prior instances, Norbert's driving resulted in

21   damage to multiple vehicles, while in one such instance, Norbert's driving resulted in

22   damage to at least one vehicle.  Further, in three of those five prior incidents, Norbert drove

23   under the influence of alcohol and/or marijuana, and, after one of those incidents, was

24   required to attend and completed a court-mandated 18-month program designed to prevent

25   further driving under the influence.

26          Prior to trial, the prosecutor requested permission to offer evidence of the five

27   above-referenced prior instances of unlawful driving by Norbert, as well as his attendance

28   in the 18-month program.  Over Norbert's objection, the trial court allowed such evidence to

1   be offered for the limited purpose of establishing that Norbert "acted in conscious disregard

2   of an actual knowledge of the danger that his conduct presented to other people." (See RT

3   115:23-25.)  As the trial court reasoned, "that awareness, that knowledge is the product of

4   the whole series of experiences that he's had, some involving ingestion of alcohol and

5   driving, mixing drinking and driving, some involving just the manner of driving, some

6   involving leading the police on a chase, but his awareness and the date of this, March of

7   2001, is a result of the collective – the cumulative, the knowledge that has accumulated

8   over a number of years which doesn't go away, particularly when it gets reinforced with a

9   number of incidents." (See RT 115:25 - 116:6.)

10      In conformity with this ruling, the trial court instructed the jury on the limited purpose

11   for which they could consider evidence of Norbert's prior driving incidents.  In particular,

12   immediately before the first such witness was to testify about a prior driving incident, the

13   trial court instructed the jury as follows:

14          [Y]ou're about to hear testimony that relates to something that happened a
            few years ago, and more than three years ago, back in 1984, as I understand
15          it.  This evidence is being presented to you for a limited purpose.  You're to
            consider it only for the purpose for which it's admitted.  That purpose, the
16          purpose for which you may consider this evidence, is in determining whether
            the mental state – whether the evidence establishes the mental state which is
17          necessary for the charge in Count One, which is the charge of murder.  At a
            later time during the trial, I'll instruct you more fully as to what that mental
18          state is and what is required.  But that is what this evidence relates to.  And
            you're not to consider it for any other purpose.  And specifically, for example,
19          this is not being offered to show that the defendant is a bad person and who
            is more likely to commit a crime than somebody else.  The limited purpose for
20          which it is being admitted, and that is mental state, it will become clearer to
            you later after you get more detailed instructions about that.
21

22   (See RT 850:14 - 851:6.)  As the trial proceeded, before any other witness began to testify

23   concerning a prior driving incident, the trial court gave a more abbreviated version of the

24   above-quoted instruction.  (See RT 874, 876-77, 893-94, 917, 929, 953-54, 1000, 1034,

25   1146.)

26      After the close of the evidence, the trial court gave another instruction identifying the

27   limited purpose for which the jury could consider evidence concerning Norbert's prior

28   //

17

driving incidents:

> Certain evidence was admitted for a limited purpose. At the time this evidence was admitted, you were instructed that it could not be considered by you for any purpose other than the limited purpose for which it was admitted.  Do not consider this evidence for any purpose except the limited purpose for which it was admitted.

> Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial.

> Except as you will otherwise be instructed, this evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes.  It may be considered by you only for the following limited purposes:

> One, in determining his believability as a witness.  The fact that a witness engaged in prior criminal conduct, if it is established, does not necessarily destroy or impair the witness's believability.  It is one of the circumstances that you may consider in weighing the testimony of that witness.

> Two, determining if it tends to show the existence of the mental state which is a necessary element of the crime of murder.

> And, three, determining if it tends to show the defendant had knowledge of the nature of the substance he allegedly possessed and transported.[6]

> For the limited purposes for which you may consider such evidence, you may weigh it in the same manner as you do all other evidence in the case.

> You are not permitted to consider such evidence for any other purpose.

(See RT 1341:22  - 1342:23.)

On direct appeal, Norbert argued the admission of the prior acts deprived him of due process.  In support of this argument, Norbert relied on McKinney v. Rees, 993 F. 2d 1378 (9th Cir. 1993).[7]  Norbert further argued the admission of the evidence prejudiced him

---

[6]As noted above, Norbert was convicted of possession of concentrated cannabis and of sale or transportation of marijuana, but does not challenge such convictions in the instant habeas action.

[7]In McKinney, the Ninth Circuit addressed a question of whether certain "other acts" evidence was "relevant to a fact of consequence" or "relevant only insofar as it prove[d] the character of the defendant in order to show conformity therewith."  See id. at 1380.  Finding the "other acts" evidence at issue therein was "probative only of character and, thus, irrelevant," and there being "no permissible inferences" the jury could have drawn from the subject evidence, the Ninth Circuit found, under the circumstances of that case, the defendant's due process rights were violated by its admission.  See id. at 1384, 1386.

1   because, according to Norbert, it created too great a "risk that [the jury] would want to

2   punish [Norbert] for acts which had nothing to do with the charges he was facing." (See

3   Resp't Ex. C at 25.)

4       The California Court of Appeal rejected Norbert's claim.  Observing that "a finding of

5   implied malice depends upon a determination that the defendant actually appreciated the

6   risk involved, i.e., a subjective standard," the Court of Appeal found the prior acts were

7   "admitted for the proper and limited purpose of proving that [Norbert] acted with the

8   requisite knowledge and intent to establish implied malice."  See Norbert, 2005 WL

9   2328792, at * 7.  In particular, the Court of Appeal reasoned, "[e]vidence that in the past

10  [Norbert] had repeatedly fled from the police or driven in a careless, intoxicated state, with

11  destructive and injurious results, and was required to attend educational classes that

12  underscored the danger of driving under the influence, raised the reasonable inference that

13  he must have recognized the palpable risk of serious harm associated with the same

14  egregious conduct on the date of the charged offense."  See id. at *8.  The Court of Appeal

15  further rejected Norbert's argument that the jury used the evidence for an improper

16  purpose:  "Identity was not an issue in the case, and we are convinced the jury did not

17  improperly view the evidence as a reflection upon [Norbert's] character to commit the

18  offense.  The trial court carefully gave a limiting instruction to the jury upon the receipt of

19  evidence of each prior incident to consider the testimony only on the issue of knowledge or

20  intent, and the jury is presumed to have adhered to the court's instructions."  See id. at *11.

21      Before this Court, Norbert does not argue that the prior acts were not relevant to a

22  fact of consequence, i.e., Norbert's mental state; rather, Norbert argues that the Court of

23  Appeal erred in finding the jury did not misuse the prior driving evidence as "propensity"

24  evidence.  In support of this assertion, Norbert argues that the "evidence had a dramatic,

25  cinematic quality which rendered any proposed limitation futile."  (See Mem. of P. & A. in

26  Support of Petition at 23:25-27, 24:24-27.)  Norbert's argument is, in essence, that the jury

27  disregarded the limited instructions repeatedly given by the trial court.

28  //

1    Norbert fails to identify any clearly established federal law as determined by the

2    United States Supreme Court that was unreasonably applied by the Court of Appeal.  In

3    any event, even if the prosecution had offered the prior driving incidents to prove Norbert's

4    propensity to commit the charged offense, which it did not, there is no clearly established

5    federal law as determined by the Supreme Court prohibiting a state from offering evidence

6    of a defendant's prior criminal conduct to prove propensity to commit a charged crime.  See

7    Estelle, 502 U.S. at 75 (identifying issue, but "express[ing] no opinion on whether a state

8    law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence

9    to show propensity to commit a charged crime").  Moreover, Norbert's argument, that the

10   jury engaged in conduct expressly prohibited by repeated instructions, is wholly

11   speculative.

12   Accordingly, Norbert has failed to show he is entitled to relief on this claim.

13   **D. Burden of Proof Instructions Re: Prior Acts Evidence**

14   The trial judge gave the jury a number of instructions regarding the prosecutor's

15   burden of proof.  With respect to such burden, the trial court first gave CALJIC 2.90:

16       A defendant in a criminal action is presumed to be innocent until the contrary
         is proved, and in case of a reasonable doubt, whether his guilt is satisfactorily
17       shown, he is entitled to a verdict of not guilty.  This presumption places upon
         the People the [burden] of proving him guilty beyond a reasonable doubt.
18
19       "Reasonable doubt" is defined as follows:  It is not a mere possible doubt;
         because everything relating to human affairs is open to some possible or
         imaginary doubt.  It is that state of the case which, after the entire comparison
20       and consideration of all the evidence, leaves the minds of the jurors in that
         condition that they cannot say they feel an abiding conviction of the truth of
21       the charge.

22   (See RT 1338:1-13.)

23   Shortly thereafter, the trial court gave an instruction based on language found in

24   CALJIC 2.23.1 and 2.50, which instruction, as discussed above, identified the limited

25   purpose for which the jury could consider the evidence concerning Norbert's prior driving

26   incidents:

27   //

28   //

20

Certain evidence was admitted for a limited purpose. At the time this evidence was admitted, you were instructed that it could not be considered by you for any purpose other than the limited purpose for which it was admitted.  Do not consider this evidence for any purpose except the limited purpose for which it was admitted.

Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial.

Except as you will otherwise be instructed, this evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes.  It may be considered by you only for the following limited purposes:

One, in determining his believability as a witness.  The fact that a witness engaged in prior criminal conduct, if it is established, does not necessarily destroy or impair the witness's believability.  It is one of the circumstances that you may consider in weighing the testimony of that witness.

Two, determining if it tends to show the existence of the mental state which is a necessary element of the crime of murder.

And, three, determining if it tends to show the defendant had knowledge of the nature of the substance he allegedly possessed and transported.

For the limited purposes for which you may consider such evidence, you may weigh it in the same manner as you do all other evidence in the case.

You are not permitted to consider such evidence for any other purpose.

(See RT 1341:22  - 1342:23.)

Immediately after giving such instruction, the trial court gave CALJIC 2.50.1, which explains the prosecutor's burden of proof with respect to the prior acts:

Within the meaning of the preceding instructions, the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed crimes other than those for which he is on trial.

You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that the defendant committed the other crimes.

If you find by a preponderance of the evidence that the other crimes were committed, you are nevertheless cautioned and reminded that before a defendant can be found guilty of any crime charged in this trial, the evidence as a whole must persuade you beyond a reasonable doubt that the defendant is guilty of that crime.

(See RT 1342:24 - 1343:8.)

//

21

The trial court next gave CALJIC 2.50.2, which defines "preponderance of the evidence":

> "Preponderance of the evidence" means evidence that has more convincing force than that opposed to it.  If the evidence is so evenly balanced that you are unable to find that the evidence on either side of an issue preponderates, your finding on that issue must be against the party who had the burden of proving it.
>
> You should consider all of the evidence bearing upon every issue regardless of who produced it.

(See RT 1343:9-16.)

On direct appeal, Norbert argued that the instruction setting forth the limited purpose, when followed by CALJIC 2.50.1 and 2.50.2, deprived Norbert of due process. Specifically, Norbert argued that, in light of such instructions, "the jury [was] permitted to resolve the issue of [Norbert's] guilt of second degree murder upon proof of less than beyond a reasonable doubt."  (See Resp't's Ex. C at 31.)  As Norbert put it, "[u]nder the above instructions, there is no guarantee that the jury did any more than determine that (1) it was more probable than not that [Norbert] committed the uncharged offenses, and (2) thus [Norbert] committed the charged offense."  (See id.)  In support of this argument, Norbert cited Carella v. California, 491 U.S. 263 (1989), in which the Supreme Court summarized the due process principle implicated by Norbert's argument, as follows:

> The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense.  Jury instructions relieving States of this burden violate a defendant's due process rights.  Such directions subvert the presumption of innocence accorded to accused persons and also invade the truth-finding task assigned solely to juries in criminal cases.

See id. at 265 (internal citations omitted).

The California Court of Appeal rejected Norbert's claim, finding that the challenged instructions correctly stated the law and, further, were not misleading as to prosecutor's burden to prove the elements of murder beyond a reasonable doubt.  Before this Court, Norbert argues that the Court of Appeal "approved proof of [ ] Norbert's mental state under a preponderance standard," and that such "error" was "not cured by other instructions

22

1  given to the jury." (See Mem. of P. & A. in Support of Petition at 21:22-25.)  The Court

2  disagrees.

3       At the outset, the Court observes that Norbert fails to identify any misstatement of

4  law in the challenged instructions.  Further, contrary to Norbert's argument, no part of the

5  Court of Appeal's opinion states, or implies, that the jury was instructed to, or did, find

6  Norbert's mental state by a preponderance of the evidence.  Indeed, the following sentence

7  appears in the very instructions he challenges:  "If you find by a preponderance of the

8  evidence that the other crimes were committed, you are nevertheless cautioned and

9  reminded that before a defendant can be found guilty of any crime charged in this trial, the

10  evidence as a whole must persuade you beyond a reasonable doubt that the defendant is

11  guilty of that crime."  (See RT 1343:3-8) (emphasis added).  In short, Norbert has failed to

12  show that the Court of Appeal's determination constituted a clearly unreasonable

13  application of the federal law set forth in Carella or any other Supreme Court opinion.

14       Accordingly, Norbert has failed to show he is entitled to relief on this claim.

15  **E.  Cumulative Effect of Errors**

16       Norbert argues he was deprived of due process as a result of the "cumulative effect"

17  of the alleged errors identified above.

18       As respondent points out, and Norbert concedes in his reply, Norbert did not exhaust

19  this claim.  In any event, Norbert has failed to show the California Court of Appeal erred in

20  finding Norbert had not been deprived of any federal right.

21                         **CONCLUSION**

22       For the reasons set forth above, the petition for a writ of habeas corpus is hereby

23  DENIED.

24       **IT IS SO ORDERED.**

25

26  Dated: November 18, 2008

27                         MAXINE M. CHESNEY
                          United States District Judge

28